639 A.2d 1332

**CARLSON MINING COMPANY, Petitioner,**

v.

**DEPARTMENT OF ENVIRONMENTAL RESOURCES, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Feb. 3, 1994.

Decided April 4, 1994.

Stephen C. Braverman, for petitioner.

Michael J. Heilman, Asst. Counsel, for respondent.

Before McGINLEY and SMITH, Judges, and KELTON, Senior Judge.

KELTON, Senior Judge.

Carlson Mining Company (Carlson) petitions for review of the October 29, 1992, June 10, 1993 and August 3, 1993 decisions of the Environmental Hearing Board (Board), which approved a proposal of the Department of Environmental Resources (DER) of a method of funding the increased cost of operating and maintaining a replacement supply of well water for one of Carlson's neighboring property owners. We affirm.

## FACTS

In proceedings before the Board, Carlson and DER entered into a stipulation of facts. They may be briefly summarized as

follows. Carlson conducted surface coal mining operations in Slippery Rock Township, Lawrence County, Pennsylvania pursuant to a mining permit. Under the permit, the DER had required that, before mining a portion of the site, Carlson should provide a replacement water supply to an adjacent landowner, Lois Mackey (Mackey). Her water supply had previously been a spring. Carlson began mining that portion of the site before providing an alternate supply. Under the enforcement proceedings which then followed, Carlson eventually installed a well and later, in response to a Board order, a water treatment system. This new system increased Mackey's water supply operation and maintenance costs by $200 a year.[1]

In its October 29, 1992 decision, the Board also held that Carlson is required to provide for the increased operation and maintenance costs of Mackey's replacement water supply on a permanent basis. Further, pursuant to the August 3, 1993 order, Carlson is required to secure an irrevocable letter of credit totalling $8,290 (R.R. 173a) to ensure that those costs are paid in the future.

### ISSUES

As noted, the parties stipulated to the facts of this case and limited the issues to the following:

(a) Is Carlson required to provide for the increased operation and maintenance costs of the Mackey replacement water supply on a permanent basis under Section 4.2(f) of

---

1. The Board characterized this increased cost as follows: "We find the five-fold increase in the cost of operating and maintaining the Mackey water supply to be more than marginally higher. It is excessive." Board's October 29, 1992 opinion at 17.

   The Board also stated:

   While it does not trouble us to say that a *de minimus* [sic] increase in the cost of operating and maintenance expenses or increased maintenance efforts, such as changing a filter, does not render a replacement supply inadequate, (i.e., the two sources are equal in all respects), we cannot find the replacement supply to be adequate in quantity and quality where such post-mining costs and efforts are more than marginally higher.

   *Id.* at 12.

the Pennsylvania Surface Mining Conservation and Reclamation Act (PaSMCRA)[2] and 25 Pa.Code § 87.119?

(b) Are the increased operation and maintenance costs of the Mackey replacement water supply sufficient to require Carlson to compensate Mackey *ad infinitum?*

(c) If the Board finds that Carlson is required to compensate Mackey for the increased operation and maintenance costs of the Mackey replacement water supply, may the Department require operators to create individual trusts or escrow accounts to provide for the payment of additional costs?

We answer "yes" to all three questions and affirm the orders of the Environmental Hearing Board.

## DISCUSSION

Section 4.2(f) of the PaSMCRA provides as follows:

Any surface mining operator or any person engaged in government-financed reclamation who affects a public or private water supply by contamination or diminution *shall restore or replace the affected supply with an alternative source of water adequate in quantity and quality for the purposes served by the supply.* If any operator shall fail to comply with the provision, the secretary may issue such orders to the operator as are necessary to assure compliance.

52 P.S. § 1396.4b(f)(1) (Emphasis added).

The DER in Sections 87.47 and 87.119 of its Rules and Regulations implements Section 4.2(f) and tracks its language, stating, in relevant part:

[Subsection 47] The [permit] application shall identify the extent to which the proposed surface mining activities may result in contamination, diminution or interruption of an underground or surface source of water within the proposed permit or adjacent area for domestic ... or other legitimate use. If contamination, pollution, diminution or interruption

2. Act of May 31, 1945, P.L. 1198, *as amended,* 52 P.S. § 1396.4b(f)(1).

may result, then the description shall identify the means to restore or replace the affected water supply in accordance with § 87.119 (relating to hydrologic balance: water rights and replacement).

[Subsection 119] The operator of any mine which affects a water supply by contamination, pollution, diminution or interruption shall restore or replace the affected water supply with an alternate source, adequate in water quantity and water quality for the purposes served by the supply. . . .

25 Pa.Code §§ 87.47 and 87.119.

In its decisions regarding the Mackey replacement water supply, the Board held that the cost of a replacement supply must be considered when deciding what constitutes an "adequate" water supply. Further, it found that a replacement supply is not adequate if the difference between the cost of the original water supply and the cost of the replacement supply is "excessive." The Board relied in part on two of its earlier cases, *Buffy & Landis v. Department of Environmental Resources,* 1990 EHB 1665 and *Gioia Coal Company v. Department of Environmental Resources,* 1986 EHB 82. The Board stated here that, if the costs and effort associated with the replacement supply are more than marginally higher or excessive, the replacement supply is inadequate unless the operator provides for the increased costs.[3]

In its argument before this Court, Carlson agrees that it is required to replace the Mackey water supply. However, Carlson does dispute the scope of an "adequate" water supply as it relates to increased operation and maintenance costs.

### A. *Carlson's Responsibilities under Section 4.2(f)*

■ Carlson contends that requiring an operator to provide for permanent operation and maintenance costs of a replace-

***

3. In its brief, Carlson appears to argue that the *Gioia* case is applicable here, and not *Buffy & Landis,* because as here, *Gioia* involved an enforcement proceeding. *Buffy & Landis,* on the other hand, involved an initial application prior to any actual interference with a water supply. We fail to follow the logic of Carlson's argument that a more lenient standard should apply to a mine operator who has already interfered with a neighbor's water supply.

ment water supply is beyond the agency's statutory and regulatory authority under PaSMCRA and the Clean Streams Law.[4]

Carlson argues that nowhere in PaSMCRA or Board regulations is DER provided with the authority to require that a coal operation: (1) provide for maintenance and operation of a replacement water supply on a permanent basis; (2) provide the owner of the water supply compensation for increased operating and maintenance costs *ad infinitum;* or (3) provide for an escrow fund or trust fund for the payment of such additional costs. Carlson contends that the DER, by its order in this case, has sought to expand its authority, to usurp the authority of the courts to award damages and to establish regulatory requirements beyond those established by PaSMC-RA and the Board. We disagree.

When an administrative agency interprets its own regulations, we must give that interpretation great weight unless it is plainly erroneous or inconsistent with the regulation. *Consumers Life Insurance Co. v. Department of Insurance,* 86 Pa.Commonwealth Ct. 90, 483 A.2d 1055 (1984).

The Board in its construction of Section 4.2(f) of PaSMCRA correctly follows the rules of statutory construction. The Legislature's intent was to protect the public from the hardships caused by partial or complete loss of water supplies by requiring surface mine operators to replace water supplies affected by their mining.[5] The Board's interpretation effectuates this intent. If cost and effort associated with a replacement water supply is not considered, a portion of the responsibility for and burden of abating the effects of surface mining shifts from the operator to the property owner who, through

4. Act of June 22, 1937, P.L.1987, *as amended* 35 P.S. §§ 691.1–691.1001.

5. Section 4.2(f) was added to the PaSMCRA in July, 1977. The only purpose of the 1977 amendments was to add water supply replacement requirements to the existing law. Section 1 of PaSMCRA sets forth the purposes of the act and states that "[t]his act shall be deemed to be an exercise of the police powers of the Commonwealth for the general welfare of the people of the Commonwealth ... to protect and maintain water supply...." 52 P.S. § 1396.1.

no fault of her own, happens to live next to a newly opened mine and suffers a permanent injury to her water supply. In imposing the water supply replacement provision, the Legislature balanced the need for protection of the environment and the need for coal.

The Board's interpretation of the statutory provisions is consistent with the normal statutory presumptions of legislative intent. The General Assembly is presumed not to intend an absurd result and it would be absurd to consider as adequate a replacement water supply a landowner could not afford. Section 1922(1) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1922(1). The Legislature is also presumed to favor public interests over private interests and the Board's interpretation of the provision clearly favors the public interest. 1 Pa.C.S. § 1922(5).

It is a well established principal that the statutory and regulatory interpretations of a regulatory agency should be accorded great deference. *Carol Lines, Inc. v. Pennsylvania Public Utility Commission*, 83 Pa.Commonwealth Ct. 393, 477 A.2d 601 (1984). We have specifically recognized the Board's expertise and have accorded great weight to its interpretation of environmental laws and regulations. *Starr v. Department of Environmental Resources*, 147 Pa.Commonwealth Ct. 196, 607 A.2d 321 (1992). Therefore, we defer to the Board's expertise and affirm its construction of Section 4.2(f).

We find that, in determining that Carlson is responsible to provide for the increased operation and maintenance costs of the replacement water supply it provided to Mackey on a permanent basis, the Board's interpretation of Section 4.2(f) was not clearly erroneous nor inconsistent with Section 4.2(f). Under the statutes, surface mine operators must replace any water supplies affected by their mining. Where a mine operator permanently deprives a landowner of his or her water supply, the operator may be responsible for the permanent replacement of the supply and for its increased operation and maintenance costs. We defer to the Board's and the DER's

technical analysis of the extent to which a neighbor's ground water will be affected by a particular mining operation. *Starr.*

## B. *Jurisdiction of the Board*

■ Carlson argues, however, that any loss to an owner as a result of a more costly replacement water supply must be addressed by the courts of common pleas, not DER. Carlson contends that "replacement" has occurred and DER cannot argue that compensation in the form of increased costs goes to either the adequacy of quality or quantity of the water and that any monetary change in position of the owner due to the operator's replacement of the supply would be actionable under the settled common law of Pennsylvania in the courts of common pleas. Although we agree that the courts do have jurisdiction over ground water damage actions, we do not agree that such jurisdiction is exclusive in a case such as this.

Under Section 4 of the Environmental Hearing Board Act,[6] "the board has the power and duty to hold hearings and issue adjudications under 2 Pa.C.S. Ch. 5 Subch. A ... on orders, permits, licenses or decisions of the department." 35 P.S. § 7514. These powers would necessarily include the power to review DER decisions concerning the adequacy of replacement water supplies affected by mining permits.

Essentially, this case is not a civil case for damages; it is an order requiring compliance with the requirements of the PaSMCRA. Because DER is authorized to enforce the requirements of the PaSMCRA, we conclude that here on appeal of the DER's order, the Board clearly had jurisdiction to review the DER's decision as to whether Mackey's replacement well was "adequate" without imposing a requirement that Carlson pay the extra costs created by its own mining operations.

Actions against mine operators to remedy inappropriate interference with ground waters or pollution of streams may take many forms and they are not mutually exclusive. *See e.g. Commonwealth v. Barnes & Tucker Co.,* 455 Pa. 392, 319 A.2d 871 (1974) (Barnes & Tucker I) (equity action by the Common-

6. Act of July 13, 1988, P.L. 530, 35 P.S. § 7514.

wealth to enjoin statutory violation and public nuisance and to recover water pollution remediation cost); *Hughes v. Emerald Mines Corporation,* 303 Pa.Superior Ct. 426, 450 A.2d 1 (1982) (civil proceeding by property owner for direct and consequential damages for loss of water supply).

Here, the proceedings were *commenced* originally before the DER when Carlson sought permission to mine next door to Mackey's property. As a part of that continuing application process, the DER staff has already completed its technical studies and has completed its detailed calculations of the cost of remedying the direct interference with the neighbor's water supply. It would be a needless expense to all of the affected parties (especially the affected home owner) to start all over again in the common pleas court, hire additional experts and repeat the work that has already been done in the DER proceedings. We do not believe that the Legislature intended to impose such an absurd result.

### C. *Duration of Carlson's Responsibilities under Section 4.2(f)*

Carlson argues that, even if it is responsible for the cost of operation and maintenance of Mackey's replacement supply, DER may not force the company to provide for permanent financial assurances *ad infinitum.* Carlson also argues that there is no substantial evidence to support the Board's finding that the increased costs to Mackey to operate and maintain the replacement supply are excessive. We disagree.

We find that substantial evidence supports the Board's finding that the increased operation and maintenance costs for Mackey's replacement water supply are excessive. The parties agreed that the replacement supply's cost was five times greater than the original supply's cost, and that the total cost increase was approximately $200 per year. (R.R. at 17a.) The Board characterized this unsolicited annual expense to Mackey as excessive. We find that the facts to which the parties stipulated constitute substantial evidence to support

the Board's finding that the increased cost is excessive and will be a permanent future expense.

### D. *Effectuating Carlson's Responsibilities under Section 4.2(f)*

■ DER has required Carlson to establish an irrevocable letter of credit for the present value of the permanent increase in operation and maintenance costs. Under the terms, if Carlson fails to pay Mackey's increased costs within 30 days after a second notice to Carlson, Mackey may collect the entire amount of the letter of credit. Carlson argues that DER is without statutory authority to order the transfer of what amounts to compensatory sum in damages from an operator to a private party.

Carlson's assertion that compensation for the increased operation and maintenance costs associated with the replacement supply constitute damages is incorrect. The funding mechanism only goes into effect if Carlson fails to pay the increased costs of the replacement supply. The water supply replacement order is not a civil action based on tort; it is based on the Commonwealth's police power under Section 1 of the PaSMCRA, 52 P.S. § 1396.1. Section 4.2(f) specifically authorizes the DER to issue orders to operators to assure compliance with that section.

The Board acted properly in approving a funding mechanism which provides for the increased operation and maintenance costs of Mackey's replacement supply on a permanent basis. That funding is not damages or a compensatory sum. Carlson has deprived Mackey of her former water supply on a permanent basis. Under Section 4.2(f), Carlson is required to replace her water supply also on a permanent basis. Section 4.2(f) authorizes DER to "issue such orders to the operator [of a mining operation] as are *necessary* to assure compliance" with its requirements. (Emphasis added).

We find that DER and the Board did not act arbitrarily or unreasonably in establishing a financial mechanism to provide for the increased operation and maintenance of the replacement supply. Due to the possibility of a company's dissolu-

tion, a change in ownership or bankruptcy, a mechanism is required to ensure that the requirements of Section 4.2(f) are effectuated. The mechanism proposed by DER and approved by the Board reasonably accommodates all parties.

For the reasons stated above, we affirm the order of the Environmental Hearing Board.

## ORDER

**AND NOW,** this 4th day of April, 1994, the orders of the Environmental Hearing Board dated October 29, 1992, June 10, 1993 and August 3, 1993 at EHB Docket No. 91–547–E are hereby affirmed.