**MAPLE CREEK MINING, INC., Petitioner**

v.

**Fred W. LANG, Jr., Joyce E. Schuping, Delores Helquist, Sherry Wisman, and Department of Environmental Protection, Respondents.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Oct. 17, 2008.

Decided March 27, 2009.

Brandon D. Coneby, Pittsburgh, for petitioner.

Kathleen Smith–Delach, Washington, for respondents, Fred W. Lang, Jr., Joyce E. Schuping, Delores Helquist and Sherry Wisman.

Michael J. Heilman, Asst. Regional Counsel, Pittsburgh, for respondent, Department of Environmental Protection.

BEFORE: LEADBETTER, President Judge, and COHN JUBELIRER, Judge, and McCLOSKEY, Senior Judge.

OPINION BY Judge COHN JUBELIRER.

This case involves application of The Bituminous Mine Subsidence and Land Conservation Act (Act).[1] Maple Creek Mining, Inc. (Maple Creek) petitions for review of the February 19, 2008 order (2008 Order) of the Environmental Hearing Board (Board), which denied its Motion for Approval of an Alternate Financial Vehicle (Motion) and directed it to pay individual Respondents, Fred W. Lang, Joyce E. Schuping, Delores Helquist, and Sherry Wisman (brothers and sisters who are collectively referred to as Landowners), $406,125.36, representing the present value of the increased operating and maintenance costs for a pond owned by Landowners (Lang Pond), within twenty days of the order. Maple Creek challenges the conclusion that it is required to make a lump-sum payment, and also argues that the Board erred by not applying the financial vehicle it proposed. Landowners and the Department of Environmental Protection (Department) argue that Maple Creek failed to file its Motion in a timely manner.

Review of the procedural history of this case is crucial for understanding the exact

---

1. Act of April 27, 1966, Special Sess., P.L. 31, *as amended,* 52 P.S. §§ 1406.1–1406.21.

issues before this Court. The Board's 2008 Order denying Maple Creek's Motion is premised on another order of the Board, dated January 12, 2006 (2006 Order), which was issued following an adjudication of claims brought by Maple Creek and Landowners. The claims brought by Maple Creek and Landowners related to damage that Maple Creek's mining activities caused to Lang Pond in August 1999. The Board's adjudication accompanying the 2006 Order established remediation efforts that Maple Creek needed to implement and required Maple Creek to maintain a specific water level on Lang Pond. Toward this end, the Board directed Maple Creek to: pay Landowners $406,125.36 (which represented the present value of the annualized increased operation and maintenance costs for Lang Pond, as calculated by the Board); or, alternatively, submit to the Board, within thirty days of the date of the order, an alternative financial vehicle for payment of the maintenance and upkeep costs.[2]

Both Maple Creek and Landowners appealed the 2006 Order. Maple Creek did not initially file its Motion in response to the Board's 2006 Order but, instead, on February 6, 2006, filed a Petition to Amend the Board's 2006 Order as Final (Petition to Amend the 2006 Order) and a Petition to Stay. Maple Creek argued that the amendment was necessary because:

> resolution of ... what is the proper "multiplier" now will substantially enhance the ultimate termination of this dispute simply because until the proper "multiplier" is known, Maple Creek submits it is not possible to finally decide on what the proper mechanism should be to "secure" that such an amount is available—simply put, the proper mechanism for funding a mechanism with a principal of, e.g., $900,000 or $150,000, will be substantially different than an appropriate mechanism funding a much larger principal, such as $400,000 or greater.

(Maple Creek Memorandum in Support of Petition to Amend the 2006 Order at 4.) Maple Creek further argued "[t]hat the Landowners contend that the principal amount to be 'funded' is almost twice what the Board has determined clearly dictates that the multiplier issue should be resolved before any further attention is paid to the issue of a 'funding mechanism.'" (Maple Creek Memorandum in Support of Petition to Amend the 2006 Order at 4 n. 2.) Pursuant to the Petition to Amend the 2006 Order, the Board amended its order to certify the order for permissive appeal. Additionally, both the Board and this Court issued orders staying the proceed-

---

2. Specifically, the Board's 2006 Order provided, in pertinent part, as follows:

> 5. Pursuant to the Mine Subsidence Act and the regulations at 25 Pa.Code. § 89.145a(f)(1)(v), Maple Creek is liable for the increased operation and maintenance costs of restoring the Lang pond, the present value of which is $406,125.36.
> 6. In accordance with the law as set forth in this adjudication, in order to meet its obligation to provide for the increased operation and maintenance costs of the Lang pond on a permanent basis, on or before *February 13, 2006* Maple Creek is ordered to do one of the following:
> (a) make a one-time lump sum payment to the Landowners in the amount of $406,125.36 which represents the present value of the annualized increased operation and maintenance costs, with notice to the Board that such payment has been made, or
> (b) develop a financial vehicle, acceptable to the Board, that will compensate the Landowners for the increased yearly operation and maintenance costs of the Lang pond, adjusted for inflation, on a permanent basis.
> (Board's 2006 Order ¶¶ 5–6 (emphasis in original).)

ings before the Board during the pendency of the appeal.[3]

Maple Creek and Landowners raised a variety of issues before this Court in their respective appeals of the Board's 2006 Order.[4] Consistent with Maple Creek's Memorandum in Support of its Petition to Amend, most of these issues related in some manner to the Board's determination of what multiplier to apply when calculating the present value of the ongoing maintenance and operation costs. This Court decided these issues in its memorandum opinion in *Maple Creek Mining, Inc. v. Lang*, Nos. 650 and 693 C.D.2006, slip op. (Pa.Cmwlth., filed December 28, 2006). In relevant part, we concluded that:

> [W]e first note that a mine operator whose mining operations have impacted

a private or public water supply "shall restore or replace the affected supply with an alternate source which adequately services in quantity and quality the premining uses of the supply or any reasonably foreseeable uses of the supply." 52 P.S. § 1406.5a(a)(1).[5] Additionally, a mine operator must provide a *"permanent* alternate source where the contamination, diminution or interruption does not abate within *three years* of the date on which the supply was adversely affected." 52 P.S. § 1406.5b(b)(2) (emphasis added). The regulations provide that "the operator shall provide for the permanent payment of the increased operating and maintenance costs of the restored or replaced supply." 25 Pa.Code § 89.145a(f)(5)(ii).

3. The Board granted the Petition to Stay on March 21, 2006 (Board's Stay Order). On March 23, 2006, the Board issued an order, which stated that "[w]e find that our Order of January 12, 2006 involves controlling questions of law as to which there is substantial ground for difference of opinion" and that "[a]n appeal from the January 12, 2006 Order may materially advance the ultimate termination of this matter." (Board Order ¶¶ 1–2, March 23, 2006.) On April 13, 2006, Senior Judge Quigley granted the petitions for permission to appeal, permitted the appeals, and also issued an Order in each appeal staying all proceedings before the Board during the pendency of the appeal.

4. This Court characterized the issues before it as follows:

> In Landowners' appeal, we have two primary issues: 1) Did the Board err in denying the petition to reopen the records; and 2) Did the Board err in accepting the Department's calculation as to the annual water needs of Landowners' pond? In Maple Creek's appeal, we have the following issues: 1) Did the Board err in concluding that Landowners are entitled to O & M costs in perpetuity; 2) Did the Board err as a matter of law when, in calculating the O & M costs, it replaced the "long-term" rate used by the Board with a "short-term" rate

of interest, and is its decision to use this rate also not supported by substantial evidence; 3) Did the Board impermissibly rewrite the terms of an Amended CO & A between the Department and Maple Creek without giving Maple Creek the opportunity to challenge the Department's determination that Lang Pond had been impacted by the operator's mining; and 4) Did the Board err by dismissing, without prejudice, Landowners' claim for increased O & M costs associated with chlorine removal from the supplemental water supplied to Lang Pond, despite concluding that Landowners had failed to meet their burden of proof on the need for such water treatment?

> *Maple Creek Mining, Inc. v. Lang*, Nos. 650 and 693 C.D. 2006, slip op. at 6–7 (Pa. Cmwlth. filed December 28, 2006).

5. The regulations repeat this requirement that mine operators "shall promptly restore or replace the affected water supply with a permanent alternate source which adequately serves the pre-mining uses of the water supply and any reasonably foreseeable uses of the water supply." 25 Pa.Code § 89.145a(b). In addition, "the operator shall provide for the permanent payment of the increased operating and maintenance costs of the restored or replacement water supply." 25 Pa.Code § 89.145a(f)(5)(ii).

Maple Creek argues that substantial evidence supports the conclusion that it has fulfilled its statutory and regulatory responsibilities. It argues that the record shows that the water supply "has been temporarily established through minimal augmentation and will be permanently re-established within the next 8–10 years." (Maple Creek's Br. at 20.) Both its expert, William Wright, and the Department's expert agree that streams naturally heal to premining flows. Maple Creek also argues that the operator is only responsible for the increased O & M costs until Landowners' needs are met and, so, the Department should create a mechanism to return the unused increased O & M costs. Accordingly, Maple Creek claims the Board erred in imposing costs in perpetuity.

The Department argues that the issue was waived because Maple Creek failed to raise it in their post-hearing briefs. We agree that the issue was waived. 25 Pa.Code § 1021.131(c) (provi[di]ng that "[a]n issue which is not argued in a post[-]hearing brief [before the Board] may be waived.")

Even if not waived, statutory and regulatory provisions, as well as precedent, that Maple Creek fails to mention, undermine its argument. Section 5.2(b)(2) of the Act requires a "permanent alternate source" of water, in a case such as this one, where the diminution has not abated within three years. Similarly, the regulations require the mining operator to provide for the permanent payment of any increase in operating and

maintenance costs. 25 Pa.Code § 89.145a. Additionally, our Court, in *Carlson Mining Company v. Department of Environmental Resources*, 163 Pa.Cmwlth. 141, 639 A.2d 1332, 1336–37 (1994), applied a similar provision in the Surface Mining Conservation and Reclamation Act to require the operator to, in perpetuity, pay the increased maintenance costs.

This issue ends up being one of credibility and substantial evidence, and, as correctly pointed out by the Department, the Board's decision is supported by the record.

(*Maple Creek*, slip op. at 13–15 (footnotes omitted and footnote added).)

Maple Creek filed with this Court an Application for Reconsideration/Reargument of the Court's opinion and order from December 28, 2006 (Reconsideration Application).[6] On February 21, 2007, this Court denied Maple Creek's Reconsideration Application. Maple Creek petitioned for allowance of appeal to the Pennsylvania Supreme Court, but made no additional efforts, before any tribunal, to stay the Board's 2006 Order. The Supreme Court denied Maple Creek's petition for allowance of appeal on November 27, 2007.

On December 28, 2007, Maple Creek filed its Motion with the Board, seeking to replace the lump-sum payment with an order that would require Maple Creek to pay yearly maintenance costs and to post a bond to ensure the payment of those costs in the event Maple Creek becomes unable to fulfill its financial obligations.[7]

---

**6.** In its Reconsideration Application, Maple Creek argued that this Court ignored and overlooked direct, relevant facts of record relating to the calculation of the increased operation and maintenance costs. The Board, in its brief in opposition to Maple Creek's Reconsideration Application, argued that, contrary to how Maple Creek set it out in its

Reconsideration Application, the "ignored" evidence conflicted with evidence that the Board had accepted, and the Board, in choosing some evidence over the other, was merely exercising its discretion as fact-finder.

**7.** Maple Creek noted that this proposal was in accordance with the Technical Guidance Document on Increased Operation and Mainte-

The Board, in its 2008 Order, denied Maple Creek's Motion and directed Maple Creek to make the lump-sum payment of $406,125.36, the amount it had previously ordered Maple Creek to pay in its 2006 Order, to Landowners within twenty days. The Board did not discuss whether Maple Creek's Motion was timely. Instead, the Board reasoned that the proposed financial vehicle contains terms that were in conflict with figures found by the Board in the earlier litigation, which the Board considered to be conclusive. Specifically, the Board explained that:

At the *Lang* trial [that culminated in the Board's 2006 Order and this Court's prior decision], a significant amount of testimony was presented on the calculation of the present value of the increased cost of operating and maintaining the Lang pond in perpetuity, and a considerable amount of analysis and discussion was given to this topic by the Board in its Adjudication. Based on evidence presented at trial, the Board determined that a multiplier of 72 was appropriate in this instance for calculating the present value of the increased operation and maintenance costs. The Board's Adjudication and findings were upheld by the Commonwealth Court.

The bond that has been proposed by Maple Creek in its motion would be calculated in accordance with the procedure set forth in the Department's Technical Guidance Document. According to an affidavit by Joel Koricich, Senior Civil Engineer Supervisor with the Department, after the *Lang* decision the Department rescinded the portion of its earlier 1999 guidance document dealing with operation and maintenance cost calculation and replaced it with the 2006 Technical Guidance Document. There is no indication that the document was developed in accordance with the calculations in the *Lang* case, and, in fact, the multiplier developed by the Department in the Technical Guidance Document is 47.01, considerably lower than the multiplier of 72 found to be appropriate in the *Lang* case. The question of whether the 2006 Technical Guidance Document is appropriate for water replacement cases other than *Lang* is not before us at this time. However, it is not applicable to *Lang* which has already been adjudicated. *To allow Maple Creek to follow the procedure set forth in the Technical Guidance Document would be to set aside the findings of our Adjudication.* Therefore, we reject Maple Creek's motion to post a bond in accordance with the Department's 2006 Technical Guidance Document as an alternative financial vehicle to compensate the Landowners for the increased yearly operation and maintenance costs of their pond.

(Board Op. at 4–5, February 19, 2008 (citation omitted) (emphasis added).) Accordingly, the Board ordered Maple Creek "to pay the Landowners the present value of the annualized increased operation and maintenance costs of Lang pond in the amount of $406,125.36." (Board Op. at 5, February 19, 2008.) Maple Creek now petitions this Court for review of the Board's order.

Before this Court, Maple Creek argues that: (1) the Board erred as a matter of law and abused its discretion by concluding that granting Maple Creek's Motion would effectively set aside the 2006 Order; and (2) the Board lacked authority to order a lump-sum payment. Underlying Maple Creek's arguments is a concern that

nance Costs of Replacement Water Supplies (Technical Guidance Document). The Department issued this Technical Guidance Document after the Board issued its 2006 Order in the present litigation.

Lang Pond will recharge itself within a few years, at which point Maple Creek should no longer be responsible for the payment of any maintenance costs. Maple Creek's concern with a lump-sum payment, among other reasons, is primarily its belief that Landowners are receiving a windfall, a lump-sum payment for perpetual maintenance costs, when, in fact, the actual maintenance costs will cease within a few years.

The Department argues that challenging the proposed financial vehicle is nothing more than a collateral attack on the operating and maintenance costs that had already been calculated by the Board in the prior litigation. The Department also argues that Maple Creek was untimely in filing its Motion because it failed to file the Motion within thirty days of this Court's order denying reconsideration, and thus, Maple Creek waived the opportunity to pursue an alternative financial vehicle.

Landowners raise the following arguments: (1) Maple Creek waived its opportunity to pursue an alternative financial vehicle by not timely filing its Motion when the Board's stay ended following this Court's decision in the prior appeal; and (2) Maple Creek cannot now challenge the lump-sum payment when it had agreed to such a payment as early as June 2003.

■ In addressing these arguments, we note that we are limited to determining whether the Board committed any errors of law, whether constitutional violations occurred, or whether any necessary findings of fact are unsupported by substantial evidence. *Pequea Township. v. Herr*, 716 A.2d 678, 684 n. 12 (Pa.Cmwlth.1998).

■ We first address the timeliness issue. The Department and Landowners argue, in their respective briefs, that Ma-

ple Creek was required to file its Motion within thirty days of this Court's denial of reconsideration in *Maple Creek*. We disagree.

In the Board's Stay Order, the Board ordered Maple Creek "to post an appeal bond in the amount of $30,000 *while this appeal is pending before the* Commonwealth Court." (Board Order, March 21, 2006 (emphasis added).)[8] In orders issued in each of the separate appeals, this Court scheduled the case for argument and also ordered that "All proceedings in these matters in the [Board] are stayed pending resolution of the instant appeals." (Court Order in *Lang v. Department of Environmental Protection* (No. 650 C.D. 2006, filed April 17, 2006); Court Order in *Maple Creek Mining, Inc. v. Lang*, (No. 693 C.D. 2006, filed April 17, 2006) (collectively referred to as the Court's Stay Orders).) The Department and Landowners argue that, based on the terms of the Board's Stay Order, Maple Creek had thirty days from the date this Court issued its denial of Maple Creek's Reconsideration Application within which to file its Motion. Maple Creek argues that the Court's Stay Orders stayed all proceedings while Maple Creek's appeal was pending and included the time the case was before the Pennsylvania Supreme Court. We agree with Maple Creek. While the Board's Stay Order was specific, limiting it to the appeals before this Court, this Court's Stay Orders were more broadly phrased and, with the broader language, included the time the case was before the Pennsylvania Supreme Court. As it appears that Maple Creek filed its Motion within thirty days of the Supreme Court denying Maple Creek's petition for allowance of appeal in the prior

8. The Board's Stay Order also directed Maple Creek "to pay the increased cost of maintaining the Lang pond as set forth in the [Board's] January 12, 2006 adjudication." (Board's Stay Order.)

litigation, we find that the Motion was not untimely.[9]

We turn now to Maple Creek's lump-sum argument, particularly that the Board erred as a matter of law and abused its discretion by concluding that granting Maple Creek's Motion would effectively set aside the 2006 Order. Maple Creek argues that the Board lacked the authority to order a lump-sum payment. We note that these arguments are, in large measure, reformulations of the same arguments raised before the Board and this Court in the earlier litigation.

In the earlier litigation, the Board heard and considered extensive expert evidence from each of the parties as to the appropriateness and type of remediation efforts available to repair and maintain Lang Pond. Additionally, the Board heard expert evidence as to the different financial measures that could be used to cover the increased costs of operating and maintaining Lang Pond in perpetuity.

The Board concluded that additional efforts in repairing Lang Pond were not necessary, but that Maple Creek would be responsible for the costs associated with operating and maintaining Lang Pond at pre-mining accident water levels. Essentially, this required the ongoing decanting of tap water into Lang Pond. The Board also concluded that the ongoing operational and maintenance costs would be satisfied by Maple Creek paying a lump-sum of $406,125.36. The lump-sum figure was calculated by multiplying what the Board concluded were the yearly operational and maintenance costs by a multiplier of 72.

One of the key points of contention in the prior litigation was what multiplier to use, with Maple Creek, the Department, the Board, and Landowners each suggesting a different multiplier value. The Department made calculations and concluded that the appropriate multiplier value was 36. Landowners and Maple Creek separately appealed the Department's determination, with each party challenging different aspects of the Department's calculation. Among the items challenged by Maple Creek was the multiplier value. As noted above, the Board heard and reviewed the evidence and modified the multiplier value by doubling it from 36 to 72.

Landowners and Maple Creek separately appealed the Board's determination, and this Court affirmed the Board's determination as to the multiplier. In doing so, we noted that the Board had the discretion to modify the calculations as it had done and that these modifications were amply based on evidence in the record. This conclusion was consistent with what Maple Creek was seeking in the interlocutory appeal—*inter alia*—a decision as to the multiplier.

█ In the present appeal, we agree, in part, with the Board's characterization of Maple Creek's argument as being a collateral attack on the operating and maintenance costs that had already been calculated by the Board in the prior litigation.

9. We find that the record of this case substantiates Maple Creek's contention that "[a]ll of the parties in this matter, including Landowners and the Department, believed and acted as though the stay remained in effect while Maple Creek exhausted all of its appeal rights (not just its appeal rights to this Court)." (Maple Creek's Br. at 28.) None of the parties sought to advance this litigation during the pendency of the petition for allowance of appeal before the Pennsylvania Supreme Court, which supports the conclusion that all believed the stay was in effect. Additionally, the Board itself, in its decision following remand, makes no mention of the timeliness issue, thus supporting the notion that the Board understood the proceedings to be stayed up until the issuance the Supreme Court's order.

While the prior litigation resolved the appropriate multiplier to apply, it left open the issue of what financial vehicle to use. To the extent that Maple Creek seeks to modify the multiplier, we agree that it cannot do so.[10] The multiplier issue has been decided, and the petition for allowance of appeal on that issue was denied by the highest court of this Commonwealth. Therefore, we cannot revisit that issue.

■ What has not been decided is the appropriate financial vehicle to apply. We understand Maple Creek's concern about the payment of a lump-sum and such a lump-sum constituting a damages windfall. This concern is appropriately anchored in the statutory language, which we do not read as providing for damages when a permanent water supply solution has been found.

We note that the Act does provide for the payment of damages when a permanent solution as to the water supply cannot be implemented within three years after being affected by mining conditions. *See* Section 5.3(a)(5) of the Act, 52 P.S. § 1406.5c(a)(5).[11] In particular, in such an instance, a landowner may either require the mine operator to "purchase the property for a sum equal to its fair market value immediately prior to the time the water supply was affected" or require the mine operator to "make a one-time payment equal to the difference between the property's fair market value immediately prior to the time the water supply was affected and at the time payment is made." Section 5.2(g) of the Act, 52 P.S. § 1406.5b(g). However, these provisions are not applicable here because a permanent water supply solution was found. As such, the issue is the establishment of a permanent means

**10.** Maple Creek argues that the Board's ordering of a lump-sum payment is not authorized by either statute or regulation. Maple Creek references documents issued by the Department, prior to 2006 and during 2006, which provide guidance as to how to handle situations such as the present one. Maple Creek contends that, prior to 2006, the Department guidance documents required "mine operators … to either reach a voluntary agreement with a water user to compensate the water user for replacements associated with a replacement water supply or place funds in an escrow account to ensure the permanent payment of the increased operation and maintenance costs associated with the replacement water supply." (Maple Creek's Br. at 11.)

Maple Creek argues that, in 2006, the Department issued the Technical Guidance Document in which the Department replaced the payment of an agreed amount into an escrow fund with the use of "a financial mechanism (such as a bond) to assure the permanent payment of operation and maintenance costs associated with a replacement water supply, and requires the mine operator to make annual payments to cover the increased operation and maintenance costs associated with the

replacement water supply." (Maple Creek's Br. at 11.)

It appears that the application of this Technical Guidance Document would alter the multiplier. For that reason, we agree with the Board that the Technical

Guidance Document is not appropriate for application in this particular litigation.

**11.** Subsection (5) provides that:

Notwithstanding the provisions of an agreement entered into under this section, in the event that an affected water supply cannot reasonably be restored or that a permanent alternate source, as described in section 5.2(i), cannot reasonably be provided within three years of the date on which the supply was adversely affected, the landowner shall have the option of proceeding pursuant to section 5.2(g) and (h). Any amounts previously paid to the landowner by the mine operator pursuant to an agreement entered into under this section that were not used by the landowner to restore or replace the affected water supply or to secure a permanent alternate source, as described in section 5.2(i), shall be deducted from the compensation determined to be due pursuant to section 5.2(g).

52 P.S. § 1406.5c(a)(5).

of restoring and maintaining the water supply for Lang Pond.

However, we also understand Landowners' desire to seek a permanent solution, as that is also anchored in the statutory language. The means for resolving this issue were initially set forth in the First Amendment to the Consent Order and Agreement (Amended CO & A) entered into between Maple Creek and the Department. Among other things, the Amended CO & A, dated June 4, 2003, "required Maple Creek to provide a calculation of the increased operating and maintenance costs (O & M), including supplemental water costs, of maintaining the pond's uses." *Maple Creek*, slip op. at 4. Paragraph 3 of the Amended CO & A indicates that a lump-sum would be used to pay these perpetual maintenance costs:

> Upon approval by the Department of the monthly operating and maintenance cost calculations, Maple Creek shall provide a financial mechanism that will ensure that the monthly operating costs are paid ad infinitum. This mechanism shall be secured within thirty (30) days of the approval of the increased O & M costs by the Department. *In lieu of immediate payment of the entire sum,* Maple

Creek may enter into a voluntary agreement with [Landowners].

(Amended CO & A ¶ 3(f)(i) (emphasis added).) While we noted in our opinion in the prior litigation that the terms of the consent decree between the Department and Maple Creek would not bind Landowners, who were not parties to the decree, in general, we find nothing in the statutory language that authorizes the payment of a lump-sum, absent an express agreement between the mine operator and the landowners. *See* Section 5.3 of the Act, 52 P.S. § 1406.5c(a).[12] While Landowners may not be bound by the terms of the Amended CO & A, they are bound by the statutory language, and that language does not explicitly authorize lump-sum payments. Landowners have presented no authority to the contrary but, instead, reference the statutory sections that we have discussed above.[13]

This litigation has persisted for some time. Seeking interlocutory relief, as both parties did in this case, invariably extends the time frame for a final resolution by breaking down the case into component parts. The prior litigation established, among other things, the multiplier to utilize. What it did not establish is an appro-

---

**12.** Section 5.3 of the Act provides, in relevant part, as follows:

(a) Nothing contained in this act shall prohibit the mine operator and landowner at any time after the effective date of this section from voluntarily entering into an agreement establishing the manner and means by which an affected water supply is to be restored or an alternate supply is to be provided or providing fair compensation for such contamination, diminution or interruption. Any release contained in such an agreement shall only be valid in releasing the operator from liability for affecting a public or private water supply by contamination, diminution or interruption if all of the following apply:

(1) It clearly states what rights are established by this act.

(2) The landowner expressly acknowledges their release for the consideration rendered.

(3) The contamination, diminution or interruption of the water supply occurs as a result of the mining contemplated by the agreement.

(4) The term of the release does not exceed thirty-five years.

52 P.S. § 1406.5c(a)(1)-(4).

**13.** We note that the primary authority in support of a lump-sum payment that Landowners rely on is Professor Dobb's Handbook on the Law of Remedies. While this learned treatise provides persuasive authority, we are bound by the language of the statutory sections.

priate financial vehicle. We stress, in establishing the financial vehicle, that the money being paid is not being paid as damages, per se, that can be used for any purpose. Rather, this money is for the very specific purpose of maintaining Lang Pond at pre-mining water levels, as established by the 2006 Order and adjudication of the Board.[14] Accordingly, this matter must be remanded for the financial vehicle component to be established.

For these reasons, we vacate the Board's 2008 Order, and we remand this matter for proceedings consistent with this opinion.

*ORDER*

**NOW,** March 27, 2009, the order of the Environmental Hearing Board in the above-captioned matter is hereby **VACATED,** and this matter is remanded for further proceedings consistent with this opinion.

Jurisdiction relinquished.

14. In filings with this Court as to various motions made during the pendency of the current appeal, Maple Creek has averred that Landowners have seized control of the tap water pipe that was installed at Lang Pond to maintain the water level, and that Landowners have not maintained the water level. Landowners have not challenged this averment. Landowners, in their own filings, have made clear a desire on their part to have control of Lang Pond to use as they wish, which includes the right to control the water level.

The terms of the Act assume that Landowners intend to keep the body of water in the condition in which it existed prior to the mine accident. The Act provides the means of accomplishing that by establishing the multiplier and the resulting financial vehicle. The Act clearly intends for the money to be used solely to maintain the body of water in a pre-accident state.